

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

GMP:JPL/FJN
F. #2014R01920

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

April 3, 2020

By ECF

The Honorable Ramon E. Reyes, Jr.
United States Magistrate Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

        Re:    United States v. Daniel Rendon Herrera
                   Criminal Docket No. 14-625 (S-3) (DLI)

Dear Judge Reyes:

        The government writes in response to defendant Daniel Rendon Herrera's April 1, 2020 motion to modify the conditions of his pretrial detention order ("Def. Mot.," ECF Docket Entry No. 96). For the reasons set forth below, this motion should be denied.

I.      The Defendant's Criminal History and Status

        On August 12, 2015, a grand jury sitting in the Eastern District of New York returned a two-count third superseding indictment against the defendant, (the "Superseding Indictment," ECF Docket Entry No. 14). The Superseding Indictment charges the defendant in Count One with engaging in a continuing criminal enterprise, in violation of Title 21, United States Code, Section 848 and in Count Two with unlawful use of firearms in furtherance of drug trafficking, in violation of Title 18, United States Code, Section 924(c), all from June 2003 through December 2014. The continuing criminal enterprise charge carries a mandatory minimum of 20 years' imprisonment.

        In April 2018, the defendant was extradited from Colombia to the Eastern District of New York to face charges on Count One.[1] As alleged in the Superseding Indictment, the defendant was the principal leader of the Urabeños Drug Trafficking Organization (the "Urabeños"). (Superseding Indictment, ¶¶ 1, 4). The Urabeños was a cocaine trafficking and paramilitary organization that raised funds by imposing a "tax" on

---

       1      The defendant was not extradited on Count Two.

multi-ton shipments of cocaine that transited through areas in Colombia controlled by the organization, which shipments were ultimately destined for importation into the United States. (Id. at ¶¶ 1-2). The Urabeños also "employed 'sicarios,' or hitmen, who carried out various acts of violence, including murders, assaults, kidnappings and assassinations . . . to collect drug debts, maintain discipline, control and expand drug territory and to promote and enhance the prestige, reputation and position of the organization." (Id. ¶ 3).

In addition to his extradition to this District, Colombia also authorized the defendant's extradition to face charges in the Southern District of New York. Specifically, the defendant is charged in the Southern District with, inter alia, conspiracy to provide material support to a foreign terrorist organization, specifically, the Autodefensas Unidas de Colombia ("AUC"), in violation of Title 18, United States Code, Section 2339B(a)(1), all from 2001 through April 2009, (the "SDNY Indictment," United States v. Rendon Herrera, Criminal Docket No. 04-962 (S-6) (LAP) (S.D.N.Y.)). As alleged in the SDNY Indictment, the "AUC was a right-wing organization whose main political objective was to defeat the left-wing Fuerzas Armadas Revolucionarios de Colombia ("FARC") in armed conflict, and remove FARC sympathizers from government and positions of influence in Colombia." (SDNY Superseding Indictment, ¶ 1). "The AUC carried out its political objectives through kidnappings, violent attacks, and the mass murder of civilians claimed by the AUC to be FARC sympathizers." (Id. at ¶ 2). "The AUC and its commanders [which included the defendant] financed their terrorist activities by imposing 'taxes' on the cocaine trafficked through AUC-controlled areas." (Id.).

In addition to the charges pending in the United States, the defendant has an extensive criminal history in Colombia. For example, documents obtained from Colombia list numerous criminal convictions and sentences for the defendant including, but not limited to, a November 5, 2013 sentence of 33 years' incarceration for conspiracy, homicide, drug trafficking, and weapons trafficking.[2] Moreover, since March 2010, the United States Department of the Treasury, Office of Foreign Assets Control, designated the defendant as a Specially Designated Narcotics Trafficker Kingpin ("SDNTK") pursuant to the Foreign Narcotics Kingpin Designation Act.[3]

---

[2] The defendant is currently serving this sentence while contemporaneously facing the charges in this case and in the Southern District pursuant to the extradition agreement from Colombia. If the defendant is released prior to the completion of the 33-year term, he must be returned to Colombia in custody. As such, and because he has no legal immigration status in the United States, the United States Department of Homeland Security, Immigration and Customs Enforcement has placed a detainer on the defendant.

[3] As an SDNTK, the defendant's assets are blocked and U.S. persons are generally prohibited from engaging in economic or trade activities with the defendant.

2

Since his extradition and throughout the pendency of ongoing pretrial proceedings, the defendant has remained in custody at the Metropolitan Detention Center in Brooklyn ("MDC").

## II. The Defendant's Medical Condition

The defendant is 55 years old and currently asymptomatic for COVID-19. The government does not dispute that the defendant suffers from chronic health issues that have required treatment, including at least one surgical procedure during his incarceration at the MDC.[4] The government also does not dispute that the defendant is at higher-risk for complications should he contract COVID-19. See People Who Are At Higher Risk For Severe Illness, available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (last accessed April 3, 2020) (listing people with conditions like the defendant's as being at higher risk for severe illness from COVID-19, regardless of their age).

## III. The Conditions at the MDC

The government has consulted with counsel for the Bureau of Prisons ("BOP") regarding the conditions at the MDC in light of the COVID-19 outbreak. The government understands from BOP personnel that one inmate at the MDC has tested positive for COVID-19 and that inmate has been placed in isolation. The government can confirm at this time that the defendant was not housed in the same unit or floor as the inmate who tested positive for COVID-19.

Additionally, the BOP has informed the government that it has implemented national measures to mitigate the spread of COVID-19 in its prisons. These measures, which have been implemented at the MDC, include the following:

- Suspension of all social and legal visits: Social and legal visits have been suspended, with case-by-case accommodations for attorney visits and legal calls. Inmates will be provided additional inmate telephone minutes each month.

- Inmate movement: All inmates are secured in their assigned cells/quarters for 14 days to minimize the spread of COVID-19. Inmates will still have access, to the extent practicable, to programs and services that are offered under normal operating procedures, such as mental health treatment and education.

- Inmate transfers: All inmate facility transfers have been suspended for 30 days, with exceptions permitted for forensic studies or medical or mental health

---

[4] The government has worked closely with defense counsel over many months, with assistance from officials at the MDC, to obtain requisite treatment for the defendant when necessary. (See, e.g., ECF Docket Entry Nos. 70, 91 (filings referring to the defendant's medical condition)).

3

treatment. The BOP is not transferring asymptomatic inmates to Federal Medical Centers.

- <u>Screening and testing of inmates</u>: All newly arriving BOP inmates are screened for COVID-19 exposure risk factors and symptoms. Inmates with exposure risk factors are quarantined. In addition, inmates exhibiting flu-like symptoms are isolated (either to single rooms or with other patients) and tested for COVID-19 in accordance with local health authority protocols.

- <u>Screening of employees</u>: All BOP employees are screened for COVID-19 exposure risk factors and symptoms each time they enter the MDC. Employees with symptoms or exposure risk are not permitted into the facility.

IV.     <u>The Instant Application</u>

The Def. Mot. requests that the defendant be transferred to another institution or that he be released if he agrees to pay for his own private security detail.

V.     <u>Legal Standard</u>

The government bears the burden of showing that the defendant should be detained, either by a showing of a preponderance of the evidence that the defendant is a flight risk or clear and convincing evidence that the defendant is a danger to the community. <u>United States v. Mercedes</u>, 254 F.3d 433, 436 (2d Cir. 2001). In cases such as this, however, where there is probable cause to believe the defendant has violated 18 U.S.C. § 924(c) and committed a controlled substance offense with a maximum term of imprisonment of ten years or more such as that charged in Count One of the Superseding Indictment, there is a statutory presumption that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community." 18 U.S.C. § 3142(e)(3)(A), (B). Even if a defendant can overcome that presumption, the special risk of dangerousness posed by defendants who have committed such crimes "remains a factor to be considered among those weighed by the district court." <u>Mercedes</u>, 254 F.3d at 436.

In determining whether a defendant poses a risk of flight or a danger to the community, courts are required to consider four factors: (1) "the nature and circumstances of the offense charged, including whether the offense is a crime of violence" or whether it "involves a . . . firearm"; (2) the "weight of the evidence against" the defendant; (3) the "history and characteristics" of the defendant, including his "criminal history" and whether he committed the charged crime while under court supervision; and (4) "the nature and seriousness of the danger . . . posed by the defendant's release." 18 U.S.C. § 3142(g).

4

### A. The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant

The offenses charged against the defendant are as serious as exist in the federal criminal code and counsel in favor of detention. The defendant is charged with, among other things, carrying out murders, assaults, kidnappings, assassinations, and other violent acts with firearms and other weapons. Importantly, the defendant is not charged with being a courier or hitman. Rather, he is charged with being the head of the one of the world's largest and most violent drug cartels. The cartel—at the direction of the defendant—carried out the violent acts described herein while importing multi-ton quantities of cocaine into the United States and providing material support to a designated terrorist organization that killed civilians. Additionally, the defendant has already been convicted in Colombia of homicide, drug trafficking, and weapons trafficking.

### B. The Weight of the Evidence

The weight of the evidence against the defendant is overwhelming. The defendant's leadership of the Urabeños and his criminal acts can be proven through recorded calls, messages between him and his co-conspirators, cooperator testimony, the defendant's own statements, law enforcement testimony, drug seizures, and other evidence. The overwhelming evidence confirms the defendant's dangerousness and gives him a strong incentive to flee rather than stand trial.

### C. The Defendant's Proposed Bail Package is Inadequate

Given the factors discussed above, there are no conditions of release that could reasonably assure that the defendant would not flee or pose a continuing danger. But even if such conditions existed, the defendant's proposed bail package would be futile for various reasons.

First, the defendant is pending charges in multiple districts. Were the Court to release him on the instant charges, he would still be subject to detention for the Southern District of New York charges. Additionally, even if both courts granted him bail, the United States would have to take the defendant into immigration custody because the defendant has no legal status in the United States. Rather, he is in the United States pursuant to an extradition agreement with the Colombian government whereby the defendant is currently serving time on his 33-year Colombian sentence. The United States is obligated to return the defendant to Colombia in custody upon his release to serve out the remainder of his sentence.[5]

---

[5] The government understands that Colombia has suspended all international flights due to the COVD-19 pandemic. As such, the defendant would remain in immigration custody until he could be returned to Colombia.

Second, the defendant's proposal to be released on the condition that he pay for his own security guards is not possible in this case. The defendant is designated as an SDNTK, which mean that U.S. persons are prohibited from engaging in economic or trade transactions with him. As such, he would be unable to contract with a private security firm. Moreover, serious questions remain as to whether such private security could reasonably perform its function consistent with social distancing protocols ordered by federal, state and local governments. Indeed, routinely exposing the defendant to a rotating squad of private security contractors, who are not subject to the extensive measures implemented at the MDC described above, would seem to actually heighten the defendant's (and the contractors') risks of exposure to the virus.

Third, the defendant's request that the Bureau of Prisons transfer him to a Federal Medical Center is not feasible. The Bureau of Prisons is not currently transferring COVID-19 asymptomatic inmates to Federal Medical Centers merely on conjecture that they could become infected at their current facility. If transfers like the defendant's were granted, the Federal Medical Centers would quickly become overwhelmed with asymptomatic patients taking up space needed for COVID-19 <u>symptomatic</u> patients and individuals needing medical care for other reasons. Moreover, even if such a transfer were possible, there is nothing in the record indicating that a hospital setting would be safer than the MDC. As explained above, there is no indication that the defendant or his housing unit has been exposed to COVID-19. The 14-day lockdown now in effect further minimizes the chance of such exposure. Transfer to a Federal Medical Center, on the other hand, would require the defendant to leave the MDC, come in contact with multiple individuals, and travel interstate to a facility where COVID-19 patients may be receiving treatment.[6]

---

[6] There are no Federal Medical Centers in the Tri-State area. The closest Federal Medical Center is located in Massachusetts.

6

VI. <u>Conclusion</u>

        For the reasons set forth above, the government respectfully requests that the defendant's motion be denied.

        Respectfully submitted,

        RICHARD P. DONOGHUE
        United States Attorney

By:         /s/

        Jonathan P. Lax
        Francisco J. Navarro
        Assistant United States Attorneys
        (718) 254-7000

cc:    Hon. Dora L. Irizarry (by e-mail)
       Johanna Zapp, Esq. (by e-mail)