1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - -X
UNITED STATES OF AMERICA,      : 14-CR-625 (DLI)
                               : 20-CR-569 (DLI)
          Plaintiff,           :
                               :
     -against-                 :
                               : United States Courthouse
DANIEL RENDON-HERRERA, a/k/a   : Brooklyn, New York
"Don Mario," a/k/a "El         :
Viejo," a/k/a "El Tio," and    :
a/k/a "La Señora,"             :
                               : Tuesday, November 2, 2021
          Defendant.           : 2:00 p.m.
- - - - - - - - - - - - - - - -X


TRANSCRIPT OF CRIMINAL CAUSE FOR A PLEADING
BEFORE THE HONORABLE DORA L. IRIZARRY
UNITED STATES DISTRICT SENIOR JUDGE



A P P E A R A N C E S:

For the Government:        BREON S. PEACE, ESQ.
                           United States Attorney
                           Eastern District of New York
                           271 Cadman Plaza East
                           Brooklyn, New York 11201
                           BY:  JONATHAN P. LAX.  ESQ.
                                FRANCISCO J. NAVARRO, ESQ.
                                Assistant United States Attorneys

For the Defendant:         THE LAW FIRM OF CÉSAR DE CASTRO, P.C.
                           7 World Trade Center
                           34th Floor
                           New York, NEW YORK 10007
                           BY:  CÉSAR DE CASTRO, ESQ.

Court Reporter:            DAVID R. ROY, RPR
                           225 Cadman Plaza East
                           Brooklyn, New York 11201
                           drroyofcr@gmail.com

Proceedings recorded by Stenographic machine shorthand,
transcript produced by Computer-Assisted Transcription.

1           P R O C E E D I N G S

2                    --oo0oo--

3           (In open court.)

4           THE COURTROOM DEPUTY:  Criminal cause for a

5    pleading, Docket Numbers 14-CR-625 and 20-CR-569,

6    United States versus Daniel Rendon-Herrera.

7           Please state your appearances.

8           MR. LAX:  Jonathan Lax --

9           THE COURT:  You may remain seated.

10          MR. LAX:  Jonathan Lax and Francisco Navarro on

11   behalf of the Government.  Good afternoon, Your Honor.

12          MR. NAVARRO:  Good afternoon.

13          THE COURT:  Good afternoon to both of you.

14          All right.  And on behalf of Mr. Rendon-Herrera,

15   please.

16          MR. DE CASTRO:  Good afternoon.  César De Castro

17   and Paralegal and Trial Preparation Assistant Kimberly

18   Tabares.

19          THE COURT:  Good afternoon to both of you.

20          Good afternoon to you, Mr. Rendon-Herrera.

21          THE DEFENDANT (THROUGH THE INTERPRETER):  Very

22   good afternoon, Your Honor, and good afternoon and to the

23   assistants in the room.

24          THE COURT:  Good afternoon.

25          And Mr. Rendon-Herrera is being assisted today

```
                        Proceedings                    3
```

1   with Spanish-language interpreters, which we have two here

2   today.

3              Can we have the names, please, of the first

4   interpreter who is assisting.

5              INTERPRETER VENANT:  J. Carlos Venant,

6   V-E-N-A-N-T.  Good afternoon, Your Honor.

7              THE COURT:  Good afternoon.

8              And are you a *per diem* or on staff here?

9              INTERPRETER VENANT:  *Per diem.*

10             THE COURT:  Okay.  Thank you.

11             And our second interpreter?

12             INTERPRETER ORRANTIA:  My name is Dagoberto

13  Orrantia; D-A-G-O-B-E-R-T-O, O-R-R-A-N-T-I-A, and I'm a

14  Certified Interpreter, *per diem.*

15             THE COURT:  All right.  Great.  Thank you very

16  much.

17             I'm going to ask the courtroom deputy to please

18  administer the oath to both interpreters.

19             You can remain seated.

20             THE COURTROOM DEPUTY:  Please raise your right

21  hands.

22             (Interpreters sworn.)

23             THE COURTROOM DEPUTY:  Thank you.

24             THE COURT:  Thank you.

25             It has taken us a long time to get here, and I'm

Proceedings                                          4

1   grateful that we can, under the circumstances, do this as an

2   in-person proceeding.  Because we still have the space

3   limitations due to social distancing, we have made this

4   proceeding accessible to the public by telephone.  That

5   access information has been provided on the Court's public

6   calendar, which is available on the Court's public website,

7   and the Court's district executive has been gracious enough

8   to provide overflow courtroom space as well, if it is so

9   needed.

10          I do want to remind attorneys, litigants, and

11  members of the press and public that pursuant to *Local Civil*

12  *Rule 1.8*, made applicable to criminal proceedings by

13  *Local Criminal Rule 1.1(b), and Administrative Order 2020-24*

14  issued by the Chief Judge of this court.

15          Any audio and/or video recording of any court

16  proceeding, whether it's completely in-person or a hybrid,

17  such as this one here, which is a combination of audio and

18  in-person, or completely remote is strictly prohibited and

19  violators will be sanctioned.  And the Court always

20  recommends that parties review the administrative order that

21  I just referred to, as it has a more wholesome discussion of

22  the conduct that is prohibited and the sanctions that can be

23  imposed for engaging in such prohibited conduct.

24          I am going to ask that everyone please remain

25  seated.  The microphones will be able to pick you up much

Proceedings                                                     5

1    better if you are seated, as well.  And I am going to ask

2    everyone, both for the sake of the court reporter and the

3    sake of the interpreters, to please try to speak slowly and

4    in sentences as short as you can make them so that they can

5    do their job as effectively as possible.

6           And I am going to let the interpreters know that

7    if you cannot hear something or if you need something

8    repeated for any reason or you need somebody to slow down,

9    just let us know, okay?  Let's raise your hand right away

10   and we'll stop everything.  And the same goes for the court

11   reporter, you know, please, if there's anything you cannot

12   hear, just let us know.

13          All right.  I know we are all speaking through

14   masks.  The microphones are really quite good at picking

15   everything up, but you do have to keep your voice up nice

16   and loudly.  This is my third proceeding for today and we

17   have been able to manage okay.  So as long as you keep your

18   voices up, we should be able to hear each other well enough.

19   Thank you.

20          And my understanding, Mr. De Castro, is that

21   Mr. Rendon-Herrera wishes to withdraw his previously entered

22   pleas of not guilty and enter a plea of guilty to Count 1 of

23   the Third Superseding Indictment under *Docket 14-CR-625*, and

24   to Count 1 of the Sixth Superseding Indictment that was

25   originally filed in the Southern District of New York and

Proceedings                                    6

1   has been transferred here pursuant to *Rule 20 of the*
2   *Federal Rules of Criminal Procedure*, and that would be under
3   *Docket Number 20-CR-569?*
4           Is that what your client wishes to do here today,
5   sir?
6           MR. DE CASTRO:  That is correct, Your Honor.
7           THE COURT:  Mr. Rendon-Herrera, is that what you
8   wish to do today?
9           THE DEFENDANT:  Yes, Your Honor.
10          THE COURT:  Please administer the oath to
11  Mr. Rendon-Herrera.
12          THE COURTROOM DEPUTY:  Please raise your right
13  hand, sir.
14  **D A N I E L  R E N D O N - H E R R E R A**,
15          called as a witness having been first duly
16          sworn/affirmed, was examined and testified as
17          follows:
18          THE DEFENDANT:  Yes, Your Honor, I swear it before
19  God.
20          THE COURT:  Thank you.  You may have a seat,
21  Mr. Rendon-Herrera.
22          All right.  And everyone can just remain seated,
23  as well.
24          And with respect to Rule 20, I did see -- I always
25  ask for the Government to provide me in advance with a draft

```
                        Proceedings                    7
```

1   of any plea document and copies of the indictment, which

2   they have done.  And there was also included a copy of what

3   appears to be a fully executed Rule 20 transfer with respect

4   to the criminal case that was filed in Southern District

5   under their *Docket Number 04-CR-962*.  I don't think that

6   anything more is required.

7           Am I correct about that?

8           MR. LAX:  I think that's correct, Your Honor.

9           THE COURT:  Okay.

10          And is there anything else, Mr. De Castro, that

11  you think is required from your client in connection with

12  that Rule 20 transfer?

13          MR. DE CASTRO:  No, I do not believe so,

14  Your Honor.

15          THE COURT:  Okay.

16          All right.  Mr. Rendon-Herrera, I am going to ask

17  you a number of questions to assure myself that your plea is

18  a valid plea.  It is very important that you understand

19  everything that is going on here today.  It is made a little

20  complicated by the fact that we are proceeding with

21  Spanish-language interpreters.  And so I want to make sure

22  that if there is anything at all that you do not understand,

23  if you do not understand the question or do not understand

24  something that I am explaining to you, please let me know

25  that right away, and I will do my best to reword the

Proceedings                                          8

1   question or explain whatever it is that you do not

2   understand.

3            Do I have your assurance, Mr. Rendon-Herrera, that

4   you will let me know if there is anything that you do not

5   understand?

6            THE DEFENDANT:  Yes, Your Honor.

7            THE COURT:  Mr. Rendon-Herrera, are you able to

8   speak and understand English?

9            THE DEFENDANT:  No, Your Honor.

10           THE COURT:  And can you read and write at all in

11  the English language, because that's a different thing?

12           THE DEFENDANT:  No.

13           THE COURT:  Okay.

14           THE DEFENDANT:  In English, no.

15           THE COURT:  Okay.  And, Mr. De Castro, my

16  understanding is that you are fluent in Spanish?

17           Am I correct about that?

18           MR. DE CASTRO:  Yes, Your Honor.

19           THE COURT:  All right.  Thank you.

20           MR. DE CASTRO:  And I should also say that so is

21  Ms. Tabares, and she has been assisting me at our meetings

22  with Mr. Rendon-Herrera.

23           THE COURT:  All right.  And so have you been able

24  to communicate with Mr. Rendon-Herrera in the Spanish

25  language?

```
                        Proceedings                     9
```

1          MR. DE CASTRO:  Yes.

2          THE COURT:  All right.

3          MR. DE CASTRO:  Yes, we have.

4          THE COURT:  Okay.  Have you ever done so with the

5     use of an interpreter --

6          MR. DE CASTRO:  Not --

7          THE COURT:  -- other than at court proceedings, I

8     mean?

9          MR. DE CASTRO:  With Mr. Rendon-Herrera, no.

10         THE COURT:  Okay.

11         MR. DE CASTRO:  I should also note, Your Honor,

12    just when you get there, the plea agreement was also

13    translated beforehand by the Government into Spanish.  I've,

14    of course, reviewed it, and I reviewed it with him and he

15    had a copy at the MDC.

16         THE COURT:  Okay.  And I may ask you about that

17    again when we get to that point.

18         MR. DE CASTRO:  Thank you, Your Honor.

19         THE COURT:  All right.  Mr. Rendon-Herrera, have

20    you had any difficulty in communicating with your attorney

21    either directly or through an interpreter perhaps during

22    court proceedings?

23         THE DEFENDANT:  Not at all, no, Your Honor.

24         THE COURT:  Do you understand that you have the

25    right to be represented by counsel at trial and at every

1   other stage of the proceedings, including this one?

2            THE DEFENDANT:  Yes, Your Honor.

3            THE COURT:  Do you understand that if you cannot

4   afford counsel, the Court may appoint counsel for you at no

5   cost to you?

6            THE DEFENDANT:  Yes, Your Honor.

7            THE COURT:  And, in fact, at one point you did

8   have retained counsel that you were paying for, and

9   the Court appointed Mr. De Castro to represent you at no

10  cost to you.

11           Do you understand that?

12           THE DEFENDANT:  Yes, I understand that,

13  Your Honor.

14           THE COURT:  Okay.  Thank you.

15           And if at any point in time you wish to consult

16  with Mr. De Castro, please let me know that and I will give

17  you the opportunity to do that.

18           Will you let me know if you wish to speak with

19  Mr. De Castro?

20           THE DEFENDANT:  Understood, Your Honor.

21           THE COURT:  And will you let me know if you want

22  to speak with him?

23           THE DEFENDANT:  Yes, Your Honor.

24           THE COURT:  Okay.  Thank you.

25           You have sworn to tell the truth.  This means that

Proceedings                                11

1  if you answer any of my questions falsely, your answers

2  later may be used against you in a separate prosecution for

3  the crimes of perjury, or of making a false statement.

4           Do you understand that?

5           THE DEFENDANT:  Yes, I understand it, Your Honor.

6           THE COURT:  All right.  What is your full name,

7  please.

8           THE DEFENDANT:  My full name is Daniel

9  Rendon-Herrera.

10           THE COURT:  Just one minute.

11           For the two people who just walked in, are you

12  both vaccinated?

13           UNIDENTIFIED FEMALES:  Yes, ma'am.

14           THE COURT:  Okay.  And, sir, you need to wear your

15  mask properly.

16           UNIDENTIFIED MALE:  (Complies.)

17           THE COURT:  Thank you, sir.

18           Mr. Rendon-Herrera, what is your age now?

19           THE DEFENDANT:  I am 56 years old.

20           THE COURT:  What is the highest grade that you

21  completed in school?

22           THE DEFENDANT:  I studied in primary school up to

23  second grade; and in the jail, I finished high school.

24           THE COURT:  And was this in Colombia?

25           THE DEFENDANT:  In Colombia, yes.

1          THE COURT:  And where were you born?

2          THE DEFENDANT:  I was born in Colombia, Amalfi,

3    Antoquia in Colombia.

4          THE COURT:  Are you a naturalized citizen of the

5    United States?

6          THE DEFENDANT:  No, Your Honor.

7          THE COURT:  Are you presently or have you recently

8    been under the care of a doctor for any reason?

9          THE DEFENDANT:  Medicated, Your Honor.

10         THE COURT:  Okay.  And I know that you have some

11   health issues because we have addressed these health issues

12   throughout the pendency of the case.  Are you taking any

13   medications right now?

14         THE DEFENDANT:  Yes, Your Honor, I am medicated.

15   I'm taking 13 pills a day.

16         THE COURT:  Do you take them at the same time or

17   do you take some in the morning and some at night?

18         THE DEFENDANT:  No.  No, I -- I have them in the

19   morning, at noon, and in the afternoon.

20         THE COURT:  What do you take in the morning?

21         THE DEFENDANT:  I took the ones from the morning.

22   I -- I haven't taken the ones for the afternoon or the

23   others for the evening.  I only took the ones for the

24   morning today.

25         THE COURT:  And which ones do you take in the

1   morning?

2           THE DEFENDANT:  In the morning, I take one for

3   cardio.  And at the moment, I -- I couldn't tell you what

4   the others are.

5           THE COURT:  Okay.

6           All right.  Do any of these medicines that you

7   take in the morning affect your ability to think clearly,

8   sir?

9           THE DEFENDANT:  No, Your Honor.

10          THE COURT:  And are you feeling okay right now,

11  Mr. Rendon-Herrera?

12          THE DEFENDANT:  Yes, Your Honor.

13          THE COURT:  Okay.  And the medications that you

14  take at night, do you still feel their effect at all into

15  the morning?

16          THE DEFENDANT:  At night.  In the morning, no, in

17  the morning I wake up fine.

18          THE COURT:  Okay.  Are you presently or have you

19  recently been under the care of a psychiatrist?

20          THE DEFENDANT:  No.  No, I haven't had any

21  consultations with psychiatrists.

22          THE COURT:  Have you ever been hospitalized or

23  treated in any way for any mental illness?

24          THE DEFENDANT:  No, Your Honor.

25          THE COURT:  Have you ever been hospitalized or

1    treated for addiction to drugs or to alcohol?

2              THE DEFENDANT:  Not either, Your Honor.

3              THE COURT:  And aside from your medicines in the

4    morning that you took this morning, have you taken any other

5    kind of narcotic drugs or over-the-counter drugs like

6    aspirin, Tylenol, anything like that in the past 24 hours,

7    except for your medicines that you told me about?

8              THE DEFENDANT:  So I did take the ones that I

9    normally take at night and one of them is aspirin.

10             THE COURT:  Okay.

11             All right.  But nothing besides what you were

12   prescribed?

13             THE DEFENDANT:  No, Your Honor.

14             THE COURT:  Okay.  In the past 24 hours have you

15   consumed any alcoholic beverages?

16             THE DEFENDANT:  No, Your Honor.

17             THE COURT:  As you are sitting here right now, is

18   your mind clear?

19             THE DEFENDANT:  Yes.  I feel I'm in perfect

20   condition, Your Honor, for this.

21             THE COURT:  Okay.  And do you understand

22   everything that is going on here today?

23             THE DEFENDANT:  Yes, Your Honor.

24             THE COURT:  And, Mr. De Castro, have you discussed

25   this matter with your client?

1          MR. DE CASTRO:  Yes, Your Honor.

2          THE COURT:  Have you discussed -- well, you

3    mentioned that you have been able to discuss it with him

4    directly in Spanish, correct?

5          MR. DE CASTRO:  Correct.

6          THE COURT:  All right.  In your opinion, is your

7    client capable of understanding the nature of these

8    proceedings?

9          MR. DE CASTRO:  He is.

10         THE COURT:  In your opinion, Mr. De Castro, does

11   he understand the rights he will be waiving by pleading

12   guilty?

13         MR. DE CASTRO:  Yes, he does.

14         THE COURT:  Do you have any doubt as to your

15   client's competence to plead at this time?

16         MR. DE CASTRO:  No doubt.

17         THE COURT:  Have you advised him of the maximum

18   sentence and fines that can be imposed?

19         MR. DE CASTRO:  I have.

20         THE COURT:  Have you discussed with him the

21   operation of the advisory sentencing guidelines?

22         MR. DE CASTRO:  Yes.

23         THE COURT:  Mr. Rendon-Herrera, have you had a

24   sufficient opportunity to discuss this case with

25   Mr. De Castro?

Proceedings                                    16

1          THE DEFENDANT:  Yes, Your Honor.

2          THE COURT:  Are you fully satisfied with the

3    representation and advice given to you in this case by

4    Mr. De Castro?

5          THE DEFENDANT:  Yes, Your Honor.

6          THE COURT:  There are two indictments that are

7    involved in this case.  Have you received copies of both of

8    these indictments?

9          THE DEFENDANT:  Yes, Your Honor.

10         THE COURT:  And did you discuss these indictments

11   with Mr. De Castro?

12         THE DEFENDANT:  Yes, Your Honor.

13         THE COURT:  All right.  We will take them one at a

14   time.

15         With respect to Count 1 under *Case

16   Number 14-CR-625*, this indictment has an introduction which

17   explains certain groups and certain parties.

18         Are you familiar with that introduction?

19         THE DEFENDANT:  I know that it discusses that I

20   was part of or participated in the *Autodefensas* Unidas de

21   Colombia.

22         THE COURT:  Okay.  That's the indictment from the

23   Southern District.  I'm talking about the Brooklyn

24   indictment, so let me go back a little bit.  And I just want

25   to summarize a little bit of what is in the introduction.

Proceedings                              17

1          So the introduction of this indictment, this is

2     the case that you have had in front of me for the past few

3     years.

4          THE DEFENDANT:  Oh, yeah.

5          THE COURT:  It defined an organization called

6     *Los Urabeños*, which is defined in the indictment as a drug

7     trafficking organization, which was a cocaine trafficking

8     and paramilitary organization based in Urubá, Colombia.  And

9     it also explains that the *Los Urabeños* were involved in

10    multi-ton shipments of cocaine from Colombia to Mexico and

11    Central America, ultimately to be imported into the

12    United States; and that the *Urabeños* coordinated the

13    production, the purchase, and transfer of shipments of

14    cocaine, as well as the receipt of shipments of cocaine in

15    Mexico and Central America.  The *Urabeños* also controlled

16    territory in various areas in Colombia and imposed attacks

17    on any drug traffickers operating in regions under the

18    control of the *Urabeños*.  And specifically the *Urabeños*

19    charged a set fee for every kilogram of cocaine that was

20    manufactured, stored, or transported through areas

21    controlled by the *Urabeños*.  *Urabeños* also employed

22    *sicarios*, or hitmen, who carried out various acts of

23    violence.  It included murders, assaults, kidnappings, and

24    assignations.  Urabeños utilized these acts of violence to

25    collect drug debts, maintain discipline, control, and expand

1    drug territory and to promote and enhance the prestige,

2    reputation, and position of the organization.

3              It is alleged that the Defendants Dairo Antonio

4    Usuga-David, also known as Otoniel, Mao, Gallo, and

5    Mauricio-Gallo; and Daniel Rendon-Herrera, also known as Don

6    Mario, were principal leaders of the *Urabeños*.

7              It is alleged that the Defendants Jairo de Jesus

8    Durango Restrepo, also known as Gua Gua; Roberto Vargas

9    Gutierrez, also known as Gavilan; Carlos Alberto Moreno

10   Turberquia, also known as Nicolas; Aristides Manuel Mesa

11   Paez, also known as El Indio; Luis Orlando Padierna Peña,

12   also known as Inglaterra; Jobanis de Jesus Avila Villadiego,

13   also known as Chiquito and Chiquito Malo; and César Daniel

14   Anaya Martinez, also known as Tierra, were commanders of the

15   *Urabeños* in charge of collecting drug taxes, managing armed

16   combatants, and maintaining control over specific

17   territorial areas within Colombia.

18             The Defendant Yony Alberto Grajales Alvarez, also

19   known as Guajiro and Paisa, was the head of a drug

20   collection office based in Cali, Colombia that was

21   responsible for collecting drug debts owed to the *Urabeños*

22   through the use of violence and threats of violence.

23             The Defendant Ramiro Caro Pineda, also known as

24   Nolasco and Hugo, was an organizer of the *Urabeños* in charge

25   of collecting drug taxes, coordinating drug shipments, and

1    maintaining control over airstrips and ports on the Atlantic

2    Coast of Colombia.

3            That is the introduction to Count 1.  And the

4    reason why I review it is because Count 1 incorporates or

5    includes that introduction within that count.

6            Do you understand that, Mr. Rendon-Herrera?

7            THE DEFENDANT:  Yes, I understand.

8            THE COURT:  And I just want to ask the Government,

9    in connection with the allocution for the continuing

10   criminal enterprise that's charged in Count 1, two things.

11   There are -- and I would like your input as well,

12   Mr. De Castro, on this.  It goes through a very long litany

13   of names, and as I reviewed it, it seems that it is the same

14   names repeated throughout, at least that first part, of the

15   Count 1 before we get to Violation 1.

16           So my first question to both sides is whether it

17   is okay if I just say the aforementioned defendants?

18           MR. LAX:  Certainly.  No objection from the

19   Government, Your Honor.

20           THE COURT:  Okay.  I have been hours behind this

21   mask, so my voice is getting a little scratchy.

22           MR. LAX:  I completely understand.

23           THE COURT:  The other question that I have in

24   terms of the allocution, is that there are a number of

25   violations, and I wanted to know whether you wanted the

1   defendant to allocute to all of the violations?

2           So Violation 1 charges the international cocaine

3   manufacturing and distribution conspiracy.  Violations 2

4   through 32, which incorporates, basically, a chart with a

5   number of, I suppose, seizures or transaction dates and that

6   would be 2 through 32.  That's for the international cocaine

7   distribution charge.  And then Violation 33, which is the

8   last violation under Count 1, is the murder conspiracy of

9   rival drug traffickers.

10          So I guess my question is, do you want an

11  allocution as to all the violations?

12          MR. LAX:  Your Honor, I don't believe it's

13  necessary.  I expect the defendant will allocute to at least

14  three, which I think is what is required to satisfy the

15  elements of the charge.  So that's all we ask for,

16  Your Honor.

17          THE COURT:  Is that your understanding, too,

18  Mr. De Castro?

19          MR. DE CASTRO:  It is, Your Honor, yes.

20          THE COURT:  Okay.  And are all three included; are

21  they spread out throughout these three -- these groups of

22  violations?

23          MR. DE CASTRO:  He prefers to allocute, just so

24  Your Honor knows, just to the 2 through 32, all those

25  shipments.

Proceedings                                    21

1        THE COURT:  Okay.

2        MR. DE CASTRO:  He won't go through each one, but

3   he will say 2 through 32, so, of course, you have a chart.

4   So if that's sufficient for the Court, our intention was to

5   do that.

6        THE COURT:  Okay.

7        MR. LAX:  Your Honor, if I may?  I will also add

8   that part of the plea agreement, which I know the Court will

9   get to, includes a stipulation as to the drug weight --

10        THE COURT:  Right.

11        MR. LAX:  -- which is 73,000 some-odd kilos of

12   cocaine, that is the sum total of Violations 2 through 32.

13        THE DEFENDANT:  2 through 32?

14        MR. LAX:  Correct.

15        THE COURT:  Okay.  So then my question to you is

16   whether I need to go through Violation 1 and Violation 33

17   with him?

18        MR. LAX:  I would suggest Violation 1, but not

19   Violation 33, Your Honor.

20        MR. DE CASTRO:  That's fine.

21        THE COURT:  Okay.

22        All right.  Did you understand what we are talking

23   about, Mr. Rendon-Herrera?

24        THE DEFENDANT:  Yes, Your Honor.

25        THE COURT:  All right.  Because the charges are a

1    little complicated, so I want to make sure that we all have

2    the same understanding.

3              So with respect to Count 1, okay, going back to

4    Count 1, besides repeating again that introduction, it also

5    alleges that in or about and between June 2003 and December

6    of 2014, both dates being approximate and inclusive, meaning

7    more or less around that time, within the extraterritorial

8    jurisdiction of the United States, meaning outside of the

9    United States, the Defendant, Dairo Antonio Usuga-David,

10   also known as Otoniel, Mao, Gallo, and Mauricio-Gallo;

11   Daniel Rendon-Herrera, also known as Don Mario; Jairo de

12   Jesus Durango Restrepo, also known as Gua Gua; Roberto

13   Vargas Gutierrez, also known as Gavilan; Carlos Alberto

14   Moreno Turberquia, also known as Nicolas; Aristides Manuel

15   Mesa Paez, also known as El Indio; Luis Orlando Padierna

16   Peña, also known as Inglaterra; Jobanis de Jesus Avila

17   Villadiego, also known as Chiquito and Chiquito Malo; César

18   Daniel Anaya Martinez, also known as Tierra; Yony Alberto

19   Grajales Alvarez, also known as Guajiro and Paisa; and

20   Ramiro Caro Pineda, also known as Nolasco and Hugo, together

21   with others, did knowingly and intentionally engage in a

22   continuing criminal enterprise in that these people that I

23   just mentioned committed violations of *Title 21,*

24   *United States Code, Sections 846, 848(e), 952(a), 959(a),*

25   *960, and 963* including Violations 1 through 33 set forth

Proceedings                                    23

1    below, which violations were part of a continuing series of

2    violations of those statutes undertaken by the defendants

3    that I just mentioned in concert with five or more persons

4    with respect to whom the Defendants Dairo Antonio

5    Usuga-David, Daniel Rendon-Herrera, Jairo de Jesus Durango

6    Restrepo, Roberto Vargas Gutierrez, Carlos Alberto Moreno

7    Turberquia, Aristides Manuel Mesa Paez, Luis Orlando

8    Padierna Peña, Jobanis de Jesus Avila Villadiego, César

9    Daniel Anaya Martinez, Yony Alberto Grajales Alvarez, and

10   Ramiro Caro Pineda occupied a supervisory and management

11   position from which continuing series of violations the

12   Defendants Dairo Antonio Usuga-David, Daniel Rendon-Herrera,

13   Jairo de Jesus Durango Restrepo, Roberto Vargas Gutierrez,

14   Carlos Alberto Moreno Turberquia, Aristides Manuel Mesa

15   Paez, Luis Orlando Padierna Peña, Jobanis de Jesus Avila

16   Villadiego, César Daniel Anaya Martinez, Yony Alberto

17   Grajales Alvarez, and Ramiro Caro Pineda obtained

18   substantial income and resources.  The continuing series of

19   violations, as defined by *Title 21 of the*

20   *United States Code, Section 848(c)*, included Violations 1

21   through 33 set forth below.  And that follows.

22            As to Violation 1, Violation 1 concerns the

23   international cocaine manufacturing and distribution

24   conspiracy.  And it is alleged that in or about and between

25   June 2003 and December 2014, both dates being approximate

Proceedings                                                    24

1    and inclusive, within the extraterritorial jurisdiction of

2    the United States, the Defendants Dairo Antonio Usuga-David,

3    also known as Otoniel, Mao, Gallo, and Mauricio-Gallo;

4    Daniel Rendon-Herrera, also known as Don Mario; Jairo de

5    Jesus Durango Restrepo, also known as Gua Gua; Roberto

6    Vargas Gutierrez, also known as Gavilan; Carlos Alberto

7    Moreno Turberquia, also known as Nicolas; Aristides Manuel

8    Mesa Paez, also known as El Indio; Luis Orlando Padierna

9    Peña, also known as Inglaterra; Jobanis de Jesus Avila

10   Villadiego, also known as Chiquito and Chiquito Malo; César

11   Daniel Anaya Martinez, also known as Tierra; Yony Alberto

12   Grajales Alvarez, also known as Guajiro and Paisa; and

13   Ramiro Caro Pineda, also known as Nolasco and Hugo, together

14   with others, did knowingly and intentionally conspire to

15   manufacture and distribute five kilograms or more of a

16   substance containing cocaine, a Schedule II controlled

17   substance, intending and knowing that such substance would

18   be unlawfully imported into the United States from a place

19   outside thereof, from a place outside of the United States,

20   in violation of *Title 21 of the United States Code,*

21   *Sections 959(a), 959(c), 960 subdivisions (a)(3), 960*

22   *subdivision (b)(1)(B)(ii) and 963.*

23             Do you understand that violation?

24             THE DEFENDANT:  Yes, Your Honor.

25             THE COURT:  With respect to Violations 2 through

1   32, and that relates to the international cocaine

2   distribution, it alleges that on or about the dates that are

3   listed below, and there's a chart that follows, all dates

4   being approximate and inclusive, so more or less around that

5   time, within the extraterritorial jurisdiction of the

6   United States, the Defendants Dairo Antonio Usuga-David,

7   also known as Otoniel, Mao, Gallo, and Mauricio-Gallo;

8   Daniel Rendon-Herrera, also known as Don Mario; Jairo de

9   Jesus Durango Restrepo, also known as Gua Gua; Roberto

10  Vargas Gutierrez, also known as Gavilan; Carlos Alberto

11  Moreno Turberquia, also known as Nicolas; Aristides Manuel

12  Mesa Paez, also known as El Indio; Luis Orlando Padierna

13  Peña, also known as Inglaterra; Jobanis de Jesus Avila

14  Villadiego, also known as Chiquito and Chiquito Malo; César

15  Daniel Anaya Martinez, also known as Tierra; Yony Alberto

16  Grajales Alvarez, also known as Guajiro and Paisa; and

17  Ramiro Caro Pineda, also known as Nolasco and Hugo, together

18  with others, did knowingly and intentionally distribute a

19  controlled substance, intending and knowing that such

20  substance would be unlawfully imported into the

21  United States from a place outside thereof, in other words

22  from outside the United States into the United States, which

23  offenses involved a substance containing cocaine, a

24  Schedule II controlled substance, in the amounts listed

25  below, contrary to Title 21 -- and below refers to a chart

1   that follows -- contrary to *Title 21 of the United States*

2   *Code, Sections 959(a), 959(c), 960 subdivision (a)(3) and*

3   *960 subdivision (b)(1)(B)(ii)* and *Title 18 of the*

4   *United States Code, Section 2.*

5          Do you understand that so far?

6          THE DEFENDANT:  Yes, Your Honor.

7          THE COURT:  Okay.  And there's a chart that

8   follows that has a number of amounts and approximate dates

9   that I assume relate to transactions or seizures?

10         MR. LAX:  Yes, Your Honor, transactions.

11         THE COURT:  Okay.  So the dates relate to the

12  transactions.

13         As to Violation 2, it's 1,600 kilograms of

14  cocaine, June 18, 2003; Violation 3, 2,040 kilograms of

15  cocaine.  These are all in kilograms, so I'm just going to

16  give you the numbers.  It is all in kilograms of cocaine.

17         Do you understand?

18         THE DEFENDANT:  Yes, Your Honor.

19         THE COURT:  Okay.  So I am just going to give you

20  the amount and the dates.

21         MR. DE CASTRO:  Your Honor, I'm also fine if you

22  want to total it because we've gone over that part.

23         THE COURT:  Okay.  Are you familiar with the chart

24  that's in that count?

25         THE DEFENDANT:  Yes, Your Honor.

```
                       Proceedings                    27

 1           THE COURT:  Okay.  So the total amount that that
 2   comes to is 73,645 kilograms of cocaine.
 3           Am I correct about that?
 4           MR. LAX:  Yes, Your Honor.
 5           THE COURT:  Do you agree?
 6           MR. DE CASTRO:  Yes, Your Honor.
 7           THE COURT:  Do you understand that?
 8           THE DEFENDANT:  Yes, I'm in agreement, too,
 9   Your Honor.
10           THE COURT:  Okay.  And so that goes through
11   Violation 32.
12           Do you want me to go through Violation 33 as well
13   him?
14           MR. LAX:  I don't think it's necessary,
15   Your Honor.
16           MR. DE CASTRO:  No, Your Honor.
17           THE COURT:  Okay.  So that is Count 1 in the
18   indictment that's been pending here in Brooklyn in front of
19   me, okay?  Then we also have the indictment that was pending
20   in the Southern District of New York that was transferred
21   here.
22           And my understanding is that you intend to plead
23   guilty to Count 1 of that indictment?
24           THE DEFENDANT:  Yes, Your Honor.
25           THE COURT:  And this is all the beginning part of
```

1   it because I don't see any specific -- I looked for it

2   yesterday when I reviewed this.  I did not see any special

3   designation for Count 1.  It was done in a different

4   district, so I guess they do things a little differently.

5   There's a special designation for Count 2.

6           MR. LAX:  Are you referring to the incorporation

7   of the introductory passage; is that what Your Honor's

8   referring to?  I'm not sure if I follow.

9           THE COURT:  The parties' intent is that he would

10  plead guilty to the first part of the indictment.

11          Do you see where it says "statutory allegations"

12  on Page 4?

13          MR. LAX:  Yes, Your Honor.

14          THE COURT:  That's what I'm assuming is the

15  beginning of Count 1.

16          MR. LAX:  Your Honor, I think Count 1 is right,

17  like --

18          MR. NAVARRO:  The beginning.

19          MR. LAX:  -- the beginning --

20          MR. DE CASTRO:  Right.  Right under --

21          THE COURT:  Did I miss something?

22          MR. LAX:  Right under the caption.

23          THE COURT:  I got you.  Thank you.  I don't know

24  what I did, but I missed that.  Okay.  All right.  Thank

25  you.

Proceedings                                                    29

1          MR. DE CASTRO:  It's not very noticeable.

2          THE COURT:  Okay.  It is just done a little

3    differently here, so I was looking for something -- or

4    something else.  Okay.

5          MR. DE CASTRO:  And they sometimes do it

6    differently there, too, even within different --

7          THE COURT:  Oh, okay.

8          All right.  As to Count 1, Mr. Rendon-Herrera,

9    this is the indictment that was pending in the federal

10   courthouse in Manhattan, okay?

11         THE DEFENDANT:  Yes.

12         THE COURT:  And charges conspiracy to provide

13   material support to a foreign terrorist organization.  It

14   begins with a background to the conspiracy as follows:  The

15   *Autodefensas* Unidas de Colombia, or AUC, was founded in 1997

16   as an umbrella group uniting a number of paramilitary bands

17   in Colombia.  The AUC was a right-wing organization whose

18   main political objective was to defeat the left-wing *Fuerzas*

19   *Armadas Revolucionarios de Colombia*, or FARC, in armed

20   conflict and remove FARC sympathizers from government and

21   positions of influence in Colombia.

22         At all times relevant to this indictment, the AUC

23   carried out its political objective through kidnapping,

24   violent attacks, and the mass murder of civilians claimed by

25   the AUC to be FARC sympathizers.  The AUC and its commanders

Proceedings                                    30

1   financed their terrorist activities by imposing taxes on the

2   cocaine traffic through AUC-controlled areas.  That is, AUC

3   commanders, including Daniel Rendon-Herrera, also known as

4   Don Mario; also known as El Viejo; also known as El Tio;

5   also known as La Señora, the defendant, required payment

6   from drug traffickers who shipped drugs through or stored

7   drugs within the AUC commanders' territory, often on a

8   per-kilogram basis.  The proceeds of those taxes were used

9   to fund the purchase of military-grade weapons, used by the

10  AUC, among other things.  The AUC was designated by the

11  United States State Department as a Foreign Terrorist

12  Organization on September 10, 2001, and as a

13  Specially Designated Global Terrorist Organization on

14  October 31, 2001, and it remains so designated.

15          At all times relevant to this indictment --

16          MR. DE CASTRO:  Your Honor, I'm sorry.  I'm sorry

17  to interrupt.  I'm wondering if they were void, because

18  unlike out of the Eastern --

19          THE COURT:  I'm sorry, say that again.

20          MR. DE CASTRO:  If they were void.

21          Unlike the Eastern District item, this

22  introduction is quite long.  It's a little long, but I can

23  say we would waive your reading of that if the Court is

24  comfortable.  And I know that it's taxing, especially in a

25  mask.  He has reviewed it.  I've review it with him.  We've

Proceedings                                      31

1    discussed that AUC allegations, and he's actually going to

2    discuss them in his allocution, as well.  But if the Court

3    is comfortable, we're fine with that.

4           THE COURT:  It's fine with me if the Government is

5    fine with that.

6           I think that that's what I was trying to get at

7    with respect to getting to the statutory allegations, which

8    starts at the top of Page 4.

9           MR. DE CASTRO:  Yeah.

10          MR. LAX:  No, we have no objection, Your Honor.

11   We're happy to begin at Page 4, if that was what the

12   question is.

13          THE COURT:  Okay.  So it's not just me, it's the

14   interpreters, as well.

15          But, Mr. Rendon-Herrera, did you understand what

16   your attorney just said?

17          THE DEFENDANT:  Yes, Your Honor, and I'm in

18   agreement.

19          THE COURT:  Okay.

20          All right.  So you understand what the

21   introduction is about?

22          THE DEFENDANT:  Yes.

23          THE COURT:  Okay.

24          All right.  So then let's start with the statutory

25   allegations.  And it is alleged that from at least in or

1   about 2001, up to and including at least in or about

2   April 2009, in an offense in and affecting interstate and

3   foreign commerce, begun and committed outside of the

4   jurisdiction of any particular State or District of the

5   United States, including Colombia and elsewhere, Daniel

6   Rendon-Herrera, also known as Don Mario, also known as

7   El Viejo, also known as El Tio, also known as La Señora, the

8   defendant, who will be first brought to and arrested in the

9   Southern District of New York, and others known and unknown,

10  unlawfully and knowingly did combine, conspire, confederate,

11  and agree together and with each other to provide material

12  support or resources, as that term is defined in *Title 18 of*

13  *the United States Code, Section 2339A, subdivision (b)*, to a

14  foreign terrorist organization, to wit, the AUC, which was

15  designated by the U.S. Secretary of State as a foreign

16  terrorist organization on or about September 10, 2001,

17  pursuant to Section 219 of the Immigration and Nationality

18  Act; which has remained on the list of designees since that

19  time; and which is currently designated as such, as of the

20  date of filing of the this Indictment.

21          It was a part and an object of the conspiracy that

22  Daniel Rendon-Herrera, also known as Don Mario, also known

23  as El Viejo, also known as El Tio, also known as La Señora,

24  the defendant, and others known and unknown, would and did

25  provide the AUC with weapons, narcotics proceeds, personnel,

Proceedings                                       33

1   and other support and resources knowing that the AUC had

2   engaged and was engaging in terrorist activity (as defined

3   in *Section 212(a), subdivision (3)(B)* of the Immigration and

4   Nationality Act), and knowing that the AUC had engaged and

5   was engaging in terrorism (as defined in *Section 140(d)(2)*

6   of the Foreign Relations Authorization Act, Fiscal Years

7   1988 and 1989), in violation of *Title 18,*

8   *United States Code, Section 2339B.*

9           And the following overt acts are relayed.  That in

10  furtherance of the conspiracy and to effect the illegal

11  object thereof, Daniel Rendon-Herrera, also known as

12  Don Mario, also known as El Viejo, also known as El Tio,

13  also known as La Señora, the defendant, committed the

14  following overt acts among others:  In or about 2001 in

15  Colombia, Rendon-Herrera established checkpoints on the

16  roads under Centauros's control to ensure that drug

17  transporters who moved narcotics through the area had paid

18  the appropriate tax.

19          In or about September 2001, in Colombia,

20  Rendon-Herrera attended a meeting of AUC commanders where

21  the risk of importing cocaine into the United States,

22  including extradition to the United States to face criminal

23  charges, were discussed.

24          In or about 2005 or 2006, in Colombia,

25  Rendon-Herrera paid approximately $100 per kilogram of

Proceedings                                    34

1   cocaine in taxes to a co-conspirator not named as a

2   defendant herein ("CC-2") so that Rendon-Herrera could

3   transport narcotics through territory controlled by CC-2.

4           In or about March 2008, Rendon-Herrera made

5   videotaped statements regarding, among other things, his

6   membership in the AUC.

7           In or about April 2008, in Colombia,

8   Rendon-Herrera possessed assault rifles, ammunition,

9   grenades, camouflage uniforms, and military backpacks.

10          Do you understand that charge?

11          THE DEFENDANT:  Yes, Your Honor.

12          THE COURT:  Do you have any questions about any of

13  that?

14          THE DEFENDANT:  No.  But I wanted to add something

15  to that.

16          THE COURT:  Well, perhaps you should speak to your

17  attorney before you say something.

18          (Pause in proceedings.)

19          MR. DE CASTRO:  I don't think -- he doesn't have

20  anything else to add.

21          THE COURT:  Okay.

22          All right.  So, Mr. Rendon-Herrera, I am going to

23  explain to you the rights that you have under the

24  Constitution and Laws of the United States, and it's

25  important that you understand these rights because these are

Proceedings                                                    35

1    the rights that you give up, or you waive, when you plead

2    guilty.  So, again, I remind you that if there is anything

3    that you do not understand, now would be the time to let me

4    know because later on it will be too late.

5              Again, do I have your assurance that you will let

6    me know if there is anything that you do not understand,

7    sir?

8              THE DEFENDANT:  Yes, I'll be paying attention.

9              THE COURT:  Okay.  The most important thing is

10   that you let me know if you do not understand something, all

11   right?

12             THE DEFENDANT:  Yes.

13             THE COURT:  Okay, perfect.

14             Now, the first and the most important thing that

15   you must understand is that you do not have to plead guilty,

16   even if you are guilty, because under our legal system, the

17   prosecutor, the Government, has the burden of proving the

18   guilt of a defendant beyond a reasonable doubt.  And if the

19   prosecutor cannot or does not meet his burden of proof or

20   their burden of proof, the jury has the duty to find the

21   defendant not guilty, even if the defendant is guilty; in

22   other words, it's a question of the quality and the quantity

23   of the proof.

24             Do you understand that?

25             THE DEFENDANT:  Yes, Your Honor, I understand

Proceedings                                    36

1   that.

2            THE COURT:  So what this means is that even if you

3   are guilty, you have a choice and it is up to you to decide

4   what to do.  It is not up to your lawyer, your family, your

5   friends, or anyone else.  You may withdraw your previously

6   entered pleas of not guilty and plead guilty as you

7   apparently wish to do today; or you may choose to go to

8   trial simply by persisting in your pleas of not guilty and

9   make the Government meet its burden of proving your guilt

10  beyond a reasonable doubt as to each one of these

11  indictments.

12           Do you understand that?

13           THE DEFENDANT:  I understand it perfectly,

14  Your Honor.

15           THE COURT:  Thank you.

16           If you plead not guilty, under the Constitution

17  and Laws of the United States, you are entitled to a speedy

18  and public trial by a jury with the assistance of counsel on

19  the charges contained in the indictment that have been filed

20  with the Court.

21           Do you understand that?

22           THE DEFENDANT:  I understand.

23           THE COURT:  At the trail, you would be presumed

24  innocent.  You would not have to prove that you are

25  innocent.  It is the Government's burden to overcome that

Proceedings                                          37

1   presumption and prove you guilty by competent evidence and

2   beyond a reasonable doubt.

3            Do you understand that?

4            THE DEFENDANT:  Yes, I understand that,

5   Your Honor.

6            THE COURT:  If the Government does not meet its

7   burden of proof, the jury would have the duty to find you

8   not guilty.

9            Do you understand?

10            THE DEFENDANT:  I understand it, Your Honor.

11            THE COURT:  All right.  By pleading guilty, you

12   are giving up your right to have the Government satisfy its

13   burden of proving that you are guilty beyond a reasonable

14   doubt.

15            Do you understand?

16            THE DEFENDANT:  Yes, I understand it.

17            THE COURT:  In the course of the trial, the

18   witnesses for the Government would have to come to court and

19   testify in your presence, and your attorney would have the

20   right to cross-examine the witnesses for the Government.

21   Your attorney could object to any evidence offered by the

22   Government and he could offer evidence on your behalf.  That

23   would include the right to *subpoena* or compel witnesses to

24   come to court and testify, and he could raise any defenses

25   that you may have under the law.

Proceedings                                      38

1          Do you understand that?

2          THE DEFENDANT:  Yes, I understand that,

3    Your Honor.

4          THE COURT:  By pleading guilty and if I accept

5    your plea, you give up your right to confront the witnesses

6    who would testify against you.  You give up your right to

7    offer any evidence on your own behalf.  You give up your

8    right to compel witnesses to come to court and testify and

9    you give up your right to raise any defenses you may have

10   under the law.

11         Do you understand that?

12         THE DEFENDANT:  Yes, I understand that,

13   Your Honor.

14         THE COURT:  At the trial you would have the right

15   to testify on your own behalf, but only if you choose to do

16   so.  You are not required to testify.  Under the

17   Constitution of the United States, a defendant in a criminal

18   case cannot be forced to take the witness stand at his trial

19   and say anything that could be used against him to show that

20   he is guilty of the crime or crimes with which he is

21   charged.  If you decided not to testify, then I would

22   instruct the jury that they could not hold your silence

23   against you.  This is called you right against

24   self-incarceration.

25         Do you understand that?

Proceedings                                      39

1          THE DEFENDANT:  Yes, I understand that,

2   Your Honor.  Thank you.

3          THE COURT:  By pleading guilty, you are admitting

4   your guilt and you give up your right against

5   self-incarceration.

6          Do you understand that?

7          THE DEFENDANT:  I understand that, Your Honor.

8          THE COURT:  If you plead guilty, I must ask you

9   questions about what you did in order to satisfy myself that

10  you, in fact, are guilty of the charge to which you are

11  pleading guilty, and you will have to answer my questions

12  truthfully and acknowledge your guilt.  In that regard I

13  remind you that you have taken an oath to answer my

14  questions truthfully.

15         Do you understand that?

16         THE DEFENDANT:  Yes, I understand that,

17  Your Honor.

18         THE COURT:  In other words, it is not enough just

19  to say that you are guilty.  You must tell me what it is

20  that you did that makes you guilty of the particular charge

21  or charges to which you are pleading guilty.

22         Do you understand that?

23         THE DEFENDANT:  Yes, I understand that, Your

24  Honor.

25         THE COURT:  If you plead guilty and I accept your

Proceedings                                    40

1   plea, sir, you will be giving up your constitutional right

2   to a trial and all the other rights that I have just

3   discussed.  There will be no further trial of any kind.  I

4   will simply enter a judgment of guilty on the basis of your

5   guilty plea.

6              Do you understand that?

7              THE DEFENDANT:  I understand it, Your Honor.

8              THE COURT:  If you decided to go to trial and a

9   jury found you guilty, you could appeal both the verdict and

10  the sentence.  In fact, if your attorney filed motions and I

11  ruled against you on the motions, you could appeal my

12  decision on the motions.  You could appeal from any of the

13  rulings I might make during the course of the trial with

14  respect to the admissibility of evidence.  However, by

15  pleading guilty and by entering into the plea agreement that

16  is before the Court, you have agreed to waive, or give up,

17  your right to appeal, or collaterally attack, all or part of

18  the sentence that I will impose, regardless of whatever term

19  of imprisonment I might impose, in terms of any term of

20  years.  And if the sentences imposed on each of the

21  indictments run concurrently with each other; so in other

22  words, let's suppose -- and I don't know what I'm going to

23  be doing just yet -- but let's suppose that I were to impose

24  a sentence on each indictment of imprisonment, but I make

25  them run consecutive to each other; in other words, you have

Proceedings                                                        41

1    to serve one sentence before you serve the other one, that's

2    what we mean by "consecutive," then you would have a right

3    to appeal from that sentence.  And obviously, your right to

4    appeal the finding of guilt is very limited because you're

5    admitting your guilt with your own mouth.

6              Do you understand that?

7              THE DEFENDANT:  Yes, I understand that.

8              THE COURT:  But if I make the sentences run

9    concurrently with each other; in other words, that they run

10   together, then you have given up your right to appeal from

11   that sentence that's imposed by the Court.

12             Do you understand?

13             THE DEFENDANT:  Yes, I understand.

14             THE COURT:  Okay.  And all this provision is

15   contained in Paragraph 5 of the plea agreement that I have

16   in front of me that we'll talk some more about in just a

17   minute.  And there are a lot of terms in here.  But you also

18   have agreed to waive all defenses based on venue.  The case

19   that was filed in the Southern District you certainly had a

20   right to have that tried in the Southern District, but it's

21   been brought here.  So there's been an agreement to transfer

22   the case here, but also you've given up your right to raise

23   any defenses based on venue either there or for any of the

24   charges with respect to where they might have occurred,

25   Mr. Rendon-Herrera.

Proceedings                                     42

1          Do you understand that?

2          THE DEFENDANT:  Yes, I understand that,

3    Your Honor.

4          THE COURT:  And you have also agreed to waive all

5    defenses based on the statute of limitations venue and

6    double jeopardy with respect to any prosecution that is not

7    time barred on the date that the agreement was signed, in

8    the event that your conviction sometime later is vacated for

9    any reason, you violate the agreement or your guilty plea is

10   withdrawn later on.

11         Do you understand that?

12         THE DEFENDANT:  I understand it, Your Honor.

13         THE COURT:  And you have also waived the right to

14   raise on appeal or on any collateral review, that's usually

15   what we call *habeas corpus* for short, any argument that the

16   statutes to which you are pleading guilty are

17   unconstitutional and that the conduct that you admit to does

18   not fall within the scope of the statutes.

19         Do you understand that?

20         THE DEFENDANT:  I understand it, Your Honor.

21         THE COURT:  And as I said, I'm not going through

22   the entire paragraph.  There were some other provisions in

23   there, but I just wanted to make sure that you in particular

24   understood those provisions.

25         Do you understand that?

Proceedings                                    43

1              THE DEFENDANT:  Yes, I do, Your Honor.

2              THE COURT:  And are you willing to give up your

3      right to a trial and the other rights that I have just

4      discussed?

5              THE DEFENDANT:  Yes, Your Honor.

6              THE COURT:  And I've been mentioning a plea

7      agreement.  I have a document marked Government's

8      Exhibit Number 1 which covers both cases.  It's got several

9      pages.  On the back it has today's date.

10             And I am assuming that that's your signature,

11     Mr. Lax, because I can make out a J?

12             MR. LAX:  It is, Your Honor.

13             THE COURT:  Okay.  And below that, is that the

14     signature of Damian Williams?

15             MR. LAX:  No, Your Honor.  That's the signature

16     of --

17             THE COURT:  Oh, okay.  That's your supervising

18     assistant.

19             MR. LAX:  Correct.

20             THE COURT:  All right.

21             MR. LAX:  And then beneath that is the supervising

22     assistant from the Southern District of New York.

23             THE COURT:  All right.  Okay.

24             MR. LAX:  Yes, on behalf of that office.

25             THE COURT:  Okay.  Thank you.

Proceedings                                        44

1          And then right underneath these signatures from

2    the Government's office there is a very brief paragraph in

3    type that says, I have read and/or had translated and read

4    to me the entire agreement and discussed it with my

5    attorney.  I understand all of its terms and am entering

6    into it knowingly and voluntarily.

7          Is that your signature right under that,

8    Mr. Rendon-Herrera?

9          THE DEFENDANT:  Yes, Your Honor.

10          THE COURT:  And, Mr. De Castro, is that your

11    signature below that of your client?

12          MR. DE CASTRO:  Yes, Your Honor.

13          THE COURT:  And you mentioned earlier that the

14    entire plea agreement had been translated for

15    Mr. Rendon-Herrera into Spanish and you had also, of course,

16    reviewed it with him?

17          MR. DE CASTRO:  Yes.

18          THE COURT:  And --

19          THE DEFENDANT:  Yes, Your Honor.

20          THE COURT:  And, Mr. Rendon-Herrera, have you read

21    this written plea agreement as translated for you?

22          THE DEFENDANT:  Yes, Your Honor.

23          THE COURT:  And did you review it with your

24    attorney?

25          THE DEFENDANT:  I reviewed it with the attorney

Proceedings                              45

1    and I received a copy in prison.

2              THE COURT:  Okay.  And do you understand all the

3    terms in the plea agreement?

4              THE DEFENDANT:  Yes, Your Honor.

5              THE COURT:  Does the written plea agreement

6    accurately represent the entire understanding or agreement

7    that you have reached with the Government?

8              THE DEFENDANT:  Yes, Your Honor.

9              THE COURT:  Mr. De Castro, have you read and

10   reviewed with your client the written plea agreement that's

11   before the Court?

12             MR. DE CASTRO:  Yes, I have.

13             THE COURT:  And does it reflect your understanding

14   of the entire agreement your clients have entered into with

15   the Government?

16             MR. DE CASTRO:  It does.

17             THE COURT:  Does this written plea agreement

18   reflect the entire agreement and understanding that the

19   Government has entered into with the defendant and his

20   counsel?

21             MR. LAX:  Yes, Your Honor, aside from the proffer

22   agreements, which were referenced in Paragraph 17.

23             THE COURT:  Okay.

24             All right.  And in connection with the proffer

25   agreement, it wasn't clear whether there was an interpreter

1    present at the proffer agreement and whether the proffer

2    agreements were translated.

3              MR. LAX:  Yes, there was and they were,

4    Your Honor.

5              THE COURT:  Okay.  It might be better practice to

6    have the interpreter sign the proffer agreement just as a

7    notation.

8              MR. LAX:  I think that's a good suggestion,

9    Your Honor, yes.  Thank you.

10             THE COURT:  Okay.

11             Now, Mr. Rendon-Herrera, I'm going to discuss with

12   you the sentencing scheme that is applicable here, and

13   that's been set forth in the first few pages of the plea

14   agreement.  And with respect -- so we're going to start with

15   what I'm going to call the Brooklyn indictment, the one that

16   I spoke to you about first and the one that's been pending

17   here in front of me for all these years.

18             THE DEFENDANT:  Yes.

19             THE COURT:  The minimum term of imprisonment is 20

20   years.  It has a maximum term of imprisonment of life.  The

21   Government's noted by way of a footnote in the plea

22   agreement that when you were extradited from the

23   Republic of Colombia, that the Government agreed that it

24   would not seek a sentence of life imprisonment, and that you

25   understand that the Government would not seek a sentence of

1    life imprisonment.

2              Do you understand that?

3              THE DEFENDANT:  Yes, I understand that,

4    Your Honor.

5              THE COURT:  Okay.  Do you also understand that

6    the Court is not bound by any recommendations that the

7    Government may or may not make?

8              THE DEFENDANT:  Yes, I do.  I understand that,

9    Your Honor.

10             THE COURT:  There is a -- if I were to impose a

11   term of imprisonment, the Court would also have to impose a

12   term of supervised release.  The maximum term of supervised

13   release that it could impose would be five years.  And what

14   that would mean is, assuming that you are not deported or

15   removed from the United States, you would be supervised by

16   the Department of Probation.  They have certain conditions

17   that they would impose like regular reporting to the

18   Department of Probation, and I could impose certain special

19   conditions of supervised release, for example, that you not

20   possess a firearm.  If you were to violate any of the

21   conditions of supervised release, whether imposed by

22   Probation or by the Court, then you could receive an

23   additional sentence of up to three years, and you would not

24   get credit for any time that you already spent in prison on

25   your prison sentence, and you would not get credit for time

Proceedings                                      48

1   you already spent on supervised release, even if you are

2   close to the end of your supervised release term.

3             Do you understand that?

4             THE DEFENDANT:  Yes, I understand.

5             THE COURT:  There is a maximum fine of $2 million.

6   And the plea agreement says that restitution is not

7   applicable.  But Count 1 doesn't incorporate a murder

8   conspiracy, and so I was curious about whether or not

9   restitution is applicable under the mandatory restitution --

10  Victim's Restitution Act?

11            MR. LAX:  Yeah, I take, Your Honor's point.  And I

12  think where we are now is that there certainly are no

13  identifiable victims that the Government is in contact with.

14  I also don't expect him to allocute to that particular

15  violation.

16            THE COURT:  Okay.

17            All right.  There is a special assessment of $100

18  on that count that I must impose.  In addition, there is a

19  criminal forfeiture, as well, for a total money judgment as

20  set forth in the plea agreement of 45,700 -- I'm sorry,

21  $45,750,000.

22            And that would cover both indictments, correct,

23  not just --

24            MR. LAX:  Yes, Your Honor, I'm sorry.

25            THE COURT:  -- Count 1?

Proceedings                                      49

1          MR. LAX:  Yes.

2          THE COURT:  All right.  And in connection with the

3    money forfeiture judgment, I would like to have a

4    preliminary order for my endorsement by November 30th.

5          MR. LAX:  Yes, Judge.

6          THE COURT:  That should give you plenty of time to

7    provide it to Mr. De Castro for his review --

8          MR. LAX:  Yes, Judge.

9          THE COURT:  -- prior to its submission.

10          MR. LAX:  Yes.

11          THE COURT:  In addition to that, because you are

12    not a citizen of the United States, a plea of guilty to this

13    count, as well as to the other count under the

14    Southern District indictment, makes you presumptively

15    removable to Colombia.  In other words, you would most

16    likely be -- you would probably be deported back to

17    Colombia.

18          Do you understand that?

19          THE DEFENDANT:  Yes, I understand that,

20    Your Honor.

21          THE COURT:  And then with -- do you have any

22    questions about this Count 1 of the Brooklyn indictment?  Do

23    you have any questions about that?

24          THE DEFENDANT:  No, Your Honor.

25          THE COURT:  Okay.

Proceedings                                    50

1          THE DEFENDANT:  It's clear.

2          THE COURT:  Thank you.

3          So with respect to the Southern District

4    indictment, there is no mandatory minimum term of

5    imprisonment.  The maximum term of imprisonment that applies

6    here is 15 years, and that's because even though currently

7    under the law if somebody committed the offense, let's say,

8    yesterday, all right, and they were pleading guilty today,

9    they would face a mandatory -- a maximum of 20 years.  But

10   because the offenses that you are alleged to have committed

11   are -- the last time was in 2009, correct?

12         THE DEFENDANT:  Yes.

13         THE COURT:  -- the maximum was 15 years at that

14   time under the law.  So we have something called the

15   *ex post facto* clause under the constitution, which means

16   that the lower penalty has to apply.

17         Do you understand -- so that's why the maximum is

18   15 years.  Do you understand?

19         THE DEFENDANT:  I understand it, Your Honor.

20         THE COURT:  Okay.  And again, there would be a

21   supervised release term, if I impose a term of imprisonment

22   on this, and the maximum term of supervised release would be

23   life.  If you were to violate any of the conditions of

24   supervised release, then you could receive an additional

25   sentence of two years without credit for any time you spent

Proceedings                                    51

1   in jail on the original sentence and without credit for any

2   time you spent on supervised release.

3          There is a maximum fine of $250,000, restitution

4   does not apply.  There is an additional special assessment

5   of $100 for this, so it's a total special assessment of

6   $200.  And again, the forfeiture that I just mentioned

7   applies to this, too.  So with the total of $45,750,000 for

8   both counts together.

9          Do you understand?

10          THE DEFENDANT:  I understand it, Your Honor.

11          THE COURT:  And as I just said, you are subject to

12   removal as a result of your plea of guilty to this count as

13   well.

14          Do you understand that?

15          THE DEFENDANT:  Yes, I understand, Your Honor.

16          THE COURT:  And understanding that you could be

17   removed, that you would likely be removed to Colombia as a

18   result of your conviction in this case, do you still wish to

19   enter a plea of guilty?

20          THE DEFENDANT:  Yes, Your Honor.

21          THE COUR:  Okay.  I also wanted to mention that

22   there are a number of things that the U.S. Attorney's Office

23   is agreeing to as a result of the parties entering into the

24   plea agreement.  It starts on Page 7.  It's Paragraph 6,

25   which is a fairly lengthy paragraph.  It starts on Page 7,

Proceedings                                                    52

1   and goes on to the top of Page 9.  I'm not going to go

2   through each item individually, but there are certain things

3   that the Government is agreeing to do, such as to dismiss

4   any open charges in the indictment under which you are

5   pleading guilty and also to dismiss any underlying

6   indictment, as well, both from the Southern District and

7   here in the Eastern District.

8          The Government has also made some agreements with

9   respect to recommendations that they will or will not make

10  at the time of the sentence.  Such as, for example, they may

11  make a recommendation to the Court that you be given credit

12  for time that you served in jail in Colombia, and with

13  respect to having the sentences run concurrent with each

14  other.  That is just an example of some of the things that

15  the Government said that they might recommend to the Court

16  at the time of sentence.

17         I just want to make sure that you understand that

18  the Court is not bound to follow any of the recommendations

19  that the Government makes or that the defense makes.  Do you

20  understand that?  They are free to make the recommendation,

21  I will certainly give every recommendation that is made to

22  the Court at the time of sentence very serious

23  consideration.  And all of these parties have been before me

24  in sentencing and they know I take it very, very seriously

25  and consider everything seriously.

Proceedings                                              53

1          But I want you to understand that.  Do you
2    understand what I'm saying?
3          THE DEFENDANT:  Yes.  I have that very clear,
4    Your Honor.
5          THE COURT:  Okay.
6          All right.  I normally like to explain to
7    defendants when they're pleading guilty exactly what's going
8    to happen.  Once I accept the plea of guilty, assuming that
9    I accept the plea of guilty today; and just very briefly I
10   just want you to understand that if that is the case, I am
11   then going to direct the Department of Probation to prepare
12   a presentence report, or PSR as we call it.  The probation
13   department is an arm of the Court.  They do not work for the
14   defense attorney and they do not work for the Government,
15   they work for the Court, and their job is to help me with
16   sentencing to get the information together.  So they're
17   going to interview you.  We will make a notation to them to
18   make sure they know that they need an interpreter, and you
19   certainly have a right to have your attorney present and I
20   strongly recommend that you have your attorney present at
21   that interview.  They're going to talk to you about
22   everything about your life from the day you were born until
23   now, your health, your finances, your family, everything;
24   your education, everything.
25          They're also going to talk to the Government to

1    find out what their evidence was in the case, and they're

2    going to write that up.  Probation is going to determine for

3    its own what it thinks the sentencing guideline range should

4    be in this case.  They might agree with your attorney.  They

5    might not agree with your attorney.  They might agree with

6    the Government, and they might not agree with the

7    Government.  At the end of the day at the time of sentence,

8    I make that final decision as to what the guideline range

9    should be, and I might not agree with anybody.  I might come

10   to a different decision, or I might agree with Probation, or

11   I might disagree with them and I might agree with the

12   lawyers.  But I make that final decision.

13           In addition, Probation is going to point out any

14   factors that they think might warrant what we call a

15   departure from the guidelines, either above what that

16   guideline range is or below the guideline range.  They will

17   also point out factors that might warrant the imposition of

18   what we call a variance, or a sentence outside the

19   guidelines, either above the guideline range or below the

20   guideline range; and they're going to make a sentence

21   recommendation.

22           When that presentence report is finished, it will

23   be disclosed to your attorney, the Government, and to the

24   Court.  We will all review it.  It will be reviewed with

25   you.  You will have an opportunity to object to anything

Proceedings                                        55

1    that is not correct in the presentence report.  If we have

2    to have a hearing, we will have a hearing.  In addition to

3    that, I always ask the lawyers to give me in writing a

4    sentence memorandum so that they can explain to me what

5    their recommendation is for sentencing and why.

6            On the date of the sentencing hearing, you will be

7    here with your lawyer, the Government will be here,

8    Probation will be here.  At that time if there are still any

9    outstanding objections to the presentence report, I will

10   resolve those objections.  I will make a determination at

11   that time what the sentence guideline range should be.  And

12   then I will hear from the lawyers as to their sentence

13   recommendations and why.  You have the right to make a

14   statement to the Court and I will be happy to give you that

15   opportunity at that time.  So it is not until all of that

16   all happens that I will know what sentence I will be

17   imposing.  We are not going to know until that time exactly

18   what the sentence guideline range is either.

19           I want you to understand this for a couple of

20   reasons:  One, it takes a long time for a presentence report

21   to be prepared.  It takes at least 12 weeks and now with

22   COVID, it's delayed even more.  So I do not want you to be

23   concerned that you pled guilty but, you know, it has been

24   two or three months and you have not come to the Court.

25   Work is being done.  It is a lot of work.  So I want you to

Proceedings                                           56

1   understand that.

2              And the other thing that I want you to understand

3   is that as I sit here today, I do not have all this

4   information.  So I do not know what sentence I will be

5   imposing at this point because I just do not have all the

6   information I need.  I do not want you to assume anything

7   from what I said that I already have some idea in my head as

8   to what the sentence will be because I just do not have all

9   the information.

10             Do you understand all of that, that I have just

11  explained to you?

12             THE DEFENDANT:  Yes, Your Honor.

13             THE COURT:  And so as I said, until the date of

14  sentence we are not going to know what the sentence

15  guideline range will be or whether there is a reason to

16  depart from the range or to impose a sentence that is a

17  variance from the range.  But at this point in time, I am

18  going to ask the attorneys to give me their best estimate as

19  to what the guidelines are likely to say, based on the facts

20  that are available to them at this point in time.  And

21  please keep in mind that this is a guess that could be

22  wrong.

23             Do you understand that?

24             THE DEFENDANT:  Yes.

25             THE COURT:  All right.

1          THE DEFENDANT:  Yes, I do.

2          THE COURT:  So what is the Government's estimate

3    as to where within the guidelines Mr. Rendon-Herrera will

4    fall?

5          MR. LAX:  Your Honor, the Government estimates an

6    offense level of 57, which is to be treated as a level of

7    43, which is the very top of the guidelines.  The

8    corresponding advisory range, notwithstanding, of course,

9    the Government's position on a life sentence, but the

10   advisory guidelines provide for life assuming that --

11         THE COURT:  With a criminal history category of

12   what?

13         MR. LAX:  Of 6.

14         THE COURT:  Thank you.

15         MR. LAX:  I would also note for the Court and for

16   the defense that there is a guideline range -- that the

17   defendant stipulates to our guideline calculation set forth

18   in the plea agreement.

19         MR. DE CASTRO:  That's correct, Your Honor.

20         THE COURT:  Thank you.

21         And in addition to that, as the Government

22   mentioned earlier, Mr. Rendon-Herrera, you also stipulated

23   to the drug quantity that we mentioned before, which was

24   73,645 kilograms.

25         Do you understand that?

Proceedings                                    58

1          THE DEFENDANT:  I understand, Your Honor.

2          THE COURT:  And one thing that I forgot to mention

3    with respect to the forfeiture, and that is that you have

4    agreed to the forfeiture, which means that you have also

5    waived any kind of procedural due process with respect to

6    the forfeiture.  That is that you have given up your right

7    to any notice with respect to the forfeiture.  You have

8    given up your right to have any jury determination with

9    respect to any issue concerning forfeiture.

10          Do you understand that?

11          THE DEFENDANT:  Yes, I have it very clear,

12   Your Honor.

13          THE COURT:  And with respect to the guideline

14   estimate, do you understand that this estimate is not

15   binding on the Government, Probation, or the Court,

16   Mr. Rendon-Herrera?

17          THE DEFENDANT:  Yes, I understand that.

18          THE COURT:  Thank you.

19          Do you also understand that if the estimate is

20   wrong, you will not be permitted to withdraw your plea of

21   guilty?

22          THE DEFENDANT:  Yes, I understand that.

23          THE COURT:  Do you have any questions that you

24   would like to ask me about the charges, your rights, or

25   anything else relating to this matter?

Proceedings                                    59

1              THE DEFENDANT:  No, Your Honor.

2              THE COURT:  Mr. De Castro, do you know of any

3      reason why your client should not plead guilty here today,

4      sir?

5              MR. DE CASTRO:  No, Your Honor.

6              THE COURT:  Are you aware of any viable legal

7      defense to the charges?

8              MR. DE CASTRO:  No.

9              THE COURT:  Mr. Rendon-Herrera, are you ready to

10     plead at this time?

11             THE DEFENDANT:  Yes, Your Honor.

12             THE COURT:  Do you wish to consult with

13     Mr. De Castro before you plead?

14             THE DEFENDANT:  No, Your Honor.

15             THE COURT:  What is your plea to Count 1 of the

16     Brooklyn indictment that charges you with a continuing

17     criminal enterprise in connection with international drug

18     trafficking conspiracy, guilty or not guilty?

19             THE DEFENDANT:  Yes, I do plead guilty.

20             THE COURT:  And with respect to the indictment

21     from the Southern District of New York, Count Number 1 of

22     that indictment, charging you with conspiracy to provide

23     material support to a foreign terrorist organization; how do

24     you plead, guilty or not guilty?

25             THE DEFENDANT:  I plead guilty.

1              THE COURT:  Are you pleading guilty voluntarily

2    and of your own free will?

3              THE DEFENDANT:  I do pled guilty from my own free

4    will.

5              THE COURT:  Has anyone threatened or forced you to

6    plead guilty?

7              THE DEFENDANT:  No, Your Honor.

8              THE COURT:  And other than the promises contained

9    in the written plea agreement, has anyone made any other

10   promises to you to get you to plead guilty?

11             THE DEFENDANT:  No, Your Honor.

12             THE COURT:  Has anyone made any promise to you as

13   to what your final sentence will be?

14             THE DEFENDANT:  No, Your Honor.

15             THE COURT:  As you will recall in the very

16   beginning of this proceeding, I reviewed the charges and the

17   indictment with you.  Do you wish for me to review them with

18   you again?

19             THE DEFENDANT:  No, Your Honor.

20             THE COURT:  At this time I would like for you to

21   describe for me in your own words what it is that you did in

22   connection with -- let's start with the Brooklyn indictment

23   first -- what you did in connection with the acts charged in

24   Count 1 that charges you with a continuing criminal

25   enterprise.

Proceedings                                    61

1          MR. LAX:  Your Honor --

2          THE COURT:  Yes, I'm sorry.

3          MR. LAX:  I'm sorry to interpret, Your Honor.  I

4    think Mr. De Castro and I are thinking the same thing.

5          So the conduct in the SDNY indictment predates the

6    conduct in the Brooklyn indictment, and I think it might

7    make sense just to move in the same sequence of time.  So it

8    may make sense to allocute as to the SDNY indictment before

9    the EDNY indictment because the allocution, I expect, will

10   roll from one into the other.

11         THE COURT:  Understood.

12         And you are in agreement with that?

13         MR. DE CASTRO:  I am, Your Honor.  As you can see,

14   he has papers in front of him.  We have been working on that

15   together that he will be reading from --

16         THE COURT:  That's fine.

17         MR. DE CASTRO:  Okay.

18         THE COURT:  I can do the mental gymnastics, that's

19   okay.

20         MR. DE CASTRO:  Thank you.  And it is

21   chronological.  Exactly what the Government was saying.

22         THE COURT:  Okay.  So I'm sorry, let's change that

23   up a little bit, as the lawyer said.  We are going to start

24   with the Southern District first, the Manhattan indictment

25   first.  Count 1 of that indictment, okay, that charges

Proceedings                                              62

1   material conspiracy to provide material support to a foreign

2   terrorist organization, and then from there move to the

3   charge in the Brooklyn indictment.

4             Do you follow what I'm saying?

5             THE DEFENDANT:  Yes, Your Honor.

6             THE COURT:  Okay.  And I understand that you have

7   written something that you would like to read?

8             THE DEFENDANT:  Yes, Your Honor.  But more than

9   reading it, explaining it to the Court.

10            THE COURT:  Okay.  Perfect.

11            Okay.  So just take your time.

12            THE DEFENDANT:  Yes, Your Honor.

13            I was a militant and I participated in an

14  organization the United Self-Defenses of Colombia from the

15  year 1991 until the year 2006.  During that period of time,

16  I had knowledge of terrorist acts such as homicides, among

17  other things.  I was a financier of a block -- yes, of a

18  block of the *Autodefensas*, and it is there where I

19  acknowledge my guilt.  Under my direction, in other words,

20  under my orders, under my command, I collected taxes under

21  the control of the *Autodefensas* in Colombia.

22            THE COURT:  So was the purpose of collecting those

23  taxes so that drugs could be transported from one place to

24  another?

25            THE DEFENDANT:  Yes, Your Honor.  It was to buy

Proceedings                                63

1   weapons and to give support to the *Autodefensas*, to the
2   paramilitary group.
3              THE COURT:  Was part of the financing also to
4   allow the transportation of narcotics?
5              THE DEFENDANT:  Yes.  Part of this money was to
6   allow for the transportation of narcotics, in other words,
7   the cocaine.  Well, it was that, it was a purchase of
8   logistics and weapons and everything.
9              THE COURT:  Does the Government -- do you need
10  more than one of two overt acts under that count?
11             MR. LAX:  Your Honor, I don't think we actually
12  need overt acts beyond what we have.  I would just inquire,
13  I think it's implicit what the defense already said, but he
14  also -- doing all these things he did it in agreement with
15  others.
16             THE COURT:  When you were engaging in this
17  activity, were you also acting together with other
18  individuals?
19             THE DEFENDANT:  Yes, Your Honor.
20             THE COURT:  And did you all agree to engage in
21  this activity together?
22             THE DEFENDANT:  Yes, Your Honor.
23             THE COURT:  Is that allocution satisfactory with
24  respect to that count?
25             MR. LAX:  Yes, Your Honor.

1          THE COURT:  Okay.

2          MR. LAX:  Thank you.

3          THE COURT:  Okay.  So then we can move, I think,

4   to the Brooklyn indictment.

5          THE DEFENDANT:  By the year 2006, the commander of

6   the entire *Autodefensas* recently demobilized, called all the

7   little commanders, among them, me, to create an organization

8   that came to be called *Heroes of Castaño*, which later on

9   became known as *Audodefensas Gaitanistas de Colombia*, which

10  the Government calls them *"Urabeños*," to which I belonged.

11  And under my responsibility -- under my responsibility, I --

12  I plotted or associated, one might say, with other people to

13  collect taxes for the transportation of coke which was

14  coming to the United States.  It was approximately --

15  approximately 73,645 kilos of cocaine.

16         THE COURT:  And those transactions involving the

17  cocaine, that happened over a period of time?

18         THE DEFENDANT:  Yes.  That happened during the

19  period of time of 2006 to 2014.

20         THE COURT:  Does the Government require any

21  additional --

22         MR. LAX:  Yes, Your Honor.

23         So the taxes were collected in connection with a

24  series of three or more cocaine trafficking instances?

25         THE COURT:  The question is whether the collection

1   of the taxes was in connection with at least three, if not

2   more, of these cocaine transactions?

3               THE DEFENDANT:  Are you asking about --

4               THE COURT:  No, how many?

5               THE DEFENDANT:  -- the time -- five or more kilos

6   of cocaine?

7               THE COURT:  I mean, how many times did this

8   happen?

9               THE DEFENDANT:  Oh, it happened during the years

10  of 2006 through '14.

11              THE COURT:  All right.  Let me rephrase the

12  question.  So did this happen more than three times during

13  that period?

14              THE DEFENDANT:  Yes, Your Honor.

15              THE COURT:  Okay.

16              All right.  Is that satisfactory to the

17  Government?

18              MR. LAX:  Also this happened in concert with five

19  or more individuals?

20              THE COURT:  In addition to the yourself, were

21  there at least five other individuals that were working with

22  you on this?

23              THE DEFENDANT:  Yes.  Yes, there were more than

24  five people who worked in this activity.

25              THE COURT:  Mr. Lax, is there any other factual

Proceedings                                    66

1    allocution?

2              MR. LAX:  And also, Your Honor, that the defendant

3    obtained substantial income or resources from those

4    narcotics trafficking violations.

5              THE COURT:  So the question is, did you make a

6    substantial amount of money or get assets as a result of

7    engaging in this activity?

8              THE DEFENDANT:  Your Honor, I did not gain any

9    benefits of my own.

10             THE COURT:  What benefits did you get?

11             THE DEFENDANT:  The defense of my integrity.

12             THE COURT:  So the allegation is that you had

13   obtained a certain amount of assets as a result.

14             THE DEFENDANT:  Money was obtained, but that was

15   invested into the structure of the organization.

16             THE COURT:  Is that allocution satisfactory to the

17   Government?

18             (Pause in proceedings.)

19             MR. LAX:  Only that that money was substantial.

20             THE COURT:  The money that you received that was

21   invested back into the organization, was that a substantial

22   amount of money?

23             THE DEFENDANT:  Yes, of course it was.  Yes,

24   Your Honor.

25             THE COURT:  Is that satisfactory to the

Proceedings                                          67

1    Government?

2              MR. LAX:  Yes, Your Honor.  Thank you.

3              THE COURT:  Is there any additional allocution you

4    would request?

5              MR. LAX:  No, Your Honor.  Thank you.

6              THE COURT:  Is there anything else, Mr. De Castro,

7    that you think the Court should inquire about?

8              MR. DE CASTRO:  No, Your Honor.  Thank you.

9              THE COURT:  Based on the information given to me,

10   I find that Mr. Rendon-Herrera is acting voluntarily; that

11   he understands his rights and the consequences of his plea;

12   and that there is a factual basis for his pleas, and I

13   therefore, accept the pleas of guilty to Count 1 under

14   *Docket Number 14-CR-625* and Count Number 1 under *Docket*

15   *Number 20-CR-569*.

16             In that long explanation that I gave about what

17   happens once the Court has accepted a plea of guilty, I just

18   want to advise the parties that the Court will issue a

19   separate scheduling order with two dates, the first date is

20   not a court date.  You are not going to come to court.  That

21   is for the disclosure of the presentence report, and the

22   second date will be for the sentencing hearing.

23             With respect to objections to the presentence

24   report, they must be in writing.  That also includes if you

25   do not have objections to the presentence report, and it is

Proceedings                                              68

1   a simultaneous submission, so 14 days after the disclosure

2   of the presentence report, the parties will indicate whether

3   or not they have objected to the presentence report in

4   writing.  Please make sure that I get a hard copy of that,

5   okay?

6          Because of COVID and because we do not know where

7   things are going to stand, I am asking to have it docketed

8   just in case things get a little dicey.  And if there are

9   objections, the adversary must respond within 14 days after,

10  again in writing.  And the proponent of the objection, if

11  you wish, must reply 14 days after that, again, in writing.

12  Make sure the objections go to Probation.  I just want a

13  courtesy copy of whatever you send to Probation.

14         With respect to the sentencing memoranda, I do ask

15  that the Government file first 14 days prior to sentencing.

16  Do not count the date of sentencing, count backwards.  Where

17  you land, that's the due date; and Defense Counsel, seven

18  days later.  And again, I only need one copy of your

19  sentencing submission.  I don't need two copies, but I do

20  need a hard copy.

21         Things happen.  Trials happen.  I know,

22  Mr. De Castro, you're busy and pretty much a solo, right,

23  still?  So if you need an extension of time for submission,

24  this is a complicated case, just let me know sufficiently in

25  advance of sentencing so I have enough time to review

Proceedings                                                    69

1   everything.  I do take a look at everything as it comes in.

2   But I spend a lot of time reviewing it when it comes

3   together.

4          Is there anything -- it looks like he is getting

5   the medical attention that he needs.

6          MR. DE CASTRO:  He's doing well, Your Honor.

7          THE COURT:  Because he's looking the best that I

8   have seen him, even through the mask.

9          You're feeling okay, Mr. Rendon-Herrera?

10         THE DEFENDANT:  Yes.  In the last month I've been

11  a lot better in my health.

12         THE COURT:  All right.  I am very glad to hear

13  that.

14         All right.  If there is nothing else, these

15  proceeding are concluded.  The Court thanks our two esteemed

16  interpreters for their service today.  And, Marshals, you

17  may take charge.

18         MR. LAX:  Thank you, Judge.

19         THE COURT:  Thank you both very much.

20         (Matter concluded.)

21                      --oo0oo--

22

23   *I (we) certify that the foregoing is a correct transcript*
     *from the record of proceedings in the above-entitled matter.*
24

25   */s/ David R. Roy*                  *November 30, 2021*
      *DAVID R. ROY*                            *Date*